UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CARTIGA, LLC,<br><br>                              Plaintiff,<br><br>                    -v-<br><br>BETTY AQUINO,<br><br>                              Defendant. | 24 Civ. 1014<br><br>OPINION & ORDER |

PAUL A. ENGELMAYER, District Judge:

Plaintiff Cartiga, LLC ("Cartiga"), a legal financial services company, brings this action

against its former employee, Betty Aquino, alleging, *inter alia*, that she misappropriated trade

secrets in violation of the Defend Trade Secrets Act ("DTSA") and breached a non-compete and

confidentiality agreement.  Aquino moves to dismiss under Federal Rule of Civil Procedure

12(b)(1) for lack of subject matter jurisdiction, Rule 12(b)(2) for lack of personal jurisdiction,

Rule 12(b)(3) for improper venue, and Rule 12(b)(6) for failure to state a claim.  The Court

denies all but the 12(b)(6) motion, which the Court grants in part.

I.      **Background**

        A.      **Factual Background**[1]

        Cartiga is a New York-based financial services company that specializes in the "highly

competitive" business of legal funding.  AC ¶¶ 20, 36.  Cartiga supplies nationwide law firms

and the firms' clients with financing to support "personal financial, medical, and household

needs while [the funding recipients] are pursuing their legal claims[.]"  *Id.* ¶ 22.  Cartiga invests

---

[1] The following facts, presumed true for purposes of resolving the motions, are drawn from the
Amended Complaint, Dkt. 15 ("AC").

substantial resources in building and maintaining relationships with its client base, the maintenance of which is critical to Cartiga's business success. *Id.* ¶ 23. Cartiga states that it creates and maintains "confidential and proprietary information" relating to its client base that includes, but is not limited to, "strategic plans for obtaining and retaining business from consumers and law firms who represent them, extensive customer data, including their identity, contact information, and pricing and terms offered to clients of specific firms." *Id.* ¶ 25. Cartiga alleges that this information is not known or generally available in the industry and that its information-gathering efforts allow it to maintain its competitive position in the market. *See id.* ¶¶ 26. As alleged, this information derives its economic value "from not being generally known to" and being "not readily ascertainable" to others. *Id.* ¶ 112.

Cartiga takes several measures to protect this information. First, it requires employees to execute employment agreements that contain confidentiality, non-compete, non-solicitation, and non-interference provisions. *Id.* ¶¶ 73, 114. Second, Cartiga stores sensitive information in a password-protected "Client Relationship Management Software" database that requires authorization and authentication to access. *Id.* ¶¶ 27, 114. Third, Cartiga requires the use of individual usernames and passwords for cases involving email or file sharing. *Id.* ¶ 114. Fourth, Cartiga uses firewall software to protect its network and grants virtual private network access only to authorized users. *Id.* Fifth, Cartiga requires employees to review their obligations regarding use and disclosure restrictions and requires former employees to sign a form acknowledging such responsibilities. *Id.*

In September 2021, Cartiga hired Aquino as a sales and business development employee. *Id.* ¶ 28; Dkt. 22 at 1. Aquino signed an agreement containing confidentiality, non-compete,

non-solicitation, and non-interference clauses as a condition of employment. *Id.* ¶¶ 72–73 (citing

Ex. 1 (the "Agreement")).  The Agreement states in relevant part:

1. **Confidential Information**: I acknowledge and agree that I will abide by my obligations to maintain the confidentiality of Confidential Information, which are set forth in the August 2021 offer letter provided to me.

2. **Non-competition**: I acknowledge and agree that, during my employment with the Company and for a one-year period following the termination of that employment relationship, I will not directly or indirectly Compete with the Company in its business, or in any business similar to that of the Company, where the Company does business.

3. **Non-solicitation; Non-interference**: I acknowledge and agree that I will abide by the non-solicitation obligations set forth in the August 2021 offer letter provided to me.  In addition, while employed by Company, and for a one (1) year period following termination of my employment with the Company, I will not:

    a. directly or indirectly solicit or induce any Customer, prospective Customer, or other Person having a business relationship with Company to terminate or otherwise alter such relationship with the Company, or directly or indirectly interfere in any other manner with the relationship the Company has with any Customer, prospective Customer, or other such Person; and/or

    b. directly or indirectly refer any actual or potential business from any Customer or prospective Customer to any other business, enterprise or Person.

    c. call upon, communicate with, or enter into any business relationship with any Customer or prospective Customer for the purpose of obtaining business or developing business relationships.

*Id.*, Ex. 1.

The Agreement also contains a forum selection clause that designates the Southern

District of New York as the sole venue for all disputes "arising out of or relating to this

Agreement or its subject matter" and identifies New York law as the substantive law governing

such disputes. *Id.*, Ex. 1.

Aquino was employed by Cartiga for more than two years. *Id.* ¶ 28. As of her voluntary separation from the company in January 2024, Aquino served as "Head of National Sales and Marketing." *Id.* ¶ 32. In that role, Aquino "led Cartiga's nationwide business development function" and "oversaw the development and pursuit of leads for consumer legal funding and law firm opportunities for Cartiga in all jurisdictions in which Cartiga does business." *Id.* (capitalization altered). The AC alleges that, by virtue of her position at Cartiga, Aquino had access to confidential information including "electronic files, systems, and databases, which contain confidential and proprietary important information regarding Cartiga's customers and its key relationships, and Cartiga's analytics of those customers and key relationships." *Id.* ¶ 42 (capitalization altered). The AC alleges that the following were not publicly available and constituted trade secrets of Cartiga: "the identity of particular referral sources at any given business relationship," "the identity of Cartiga's clients who obtain more funding than other clients," "Cartiga's strategic plans for accessing, obtaining, and retaining those clients and relationships," and "client lists [and] the rates offered to clients." *Id.* ¶¶ 59–61.

The AC alleges that in the weeks before and after her separation, Aquino engaged in conduct violating the restrictive covenants in her agreement. *Id.* ¶ 47. It claims that Aquino "actively" solicited current and prospective clients and their referral sources, encouraged those clients to sever their relationships with Cartiga, and sought to retain those clients for herself. *Id.* ¶¶ 49–53, 70, 104. It alleges that Aquino is "disclosing and using Cartiga's trade secrets" and that she "made a concerted effort to acquire and aggregate, and subsequently absconded with, the identities of key referral sources and clients of Cartiga." *Id.* ¶¶ 70, 17 (cleaned up). It alleges that "[Aquino's] conduct resulted in the severance of Cartiga's prospective business relationships

with Cartiga's current and prospective clients and relationships." *Id.* ¶ 126 (capitalization altered).

### B.    Procedural History

On February 12, 2024, Cartiga filed the Complaint. Dkt. 1. It brings a federal claim for misappropriation of trade secrets under the DTSA. It also brings state-law claims for breach of contract, tortious interference with prospective economic advantage, and breach of fiduciary duty. It seeks, *inter alia*, damages and injunctive relief.

On February 21, 2024, Cartiga requested leave to file a motion for a preliminary injunction against Aquino. Dkt. 5. On February 22, 2024, the Court granted that request. Dkt. 7. No such motion was filed. On April 10, 2024, after an extension, Aquino filed a motion to dismiss. Dkt. 11. The next day, the Court directed Cartiga, by May 1, 2024, to file any amended complaint or opposition to the motion. Dkt. 14.

On May 1, 2024, Cartiga filed its Amended Complaint, containing the same claims. Dkt. 15. On May 22, 2024, Aquino filed a renewed motion to dismiss. Dkt. 17 ("D. Mem."). On June 5, 2024, Cartiga opposed. Dkt. 22 ("Pl. Mem."). On June 12, 2024, Aquino replied. Dkt. 24.

## II.    Discussion

Aquino moves for dismissal for lack of subject matter jurisdiction under Rule 12(b)(1), for lack of personal jurisdiction under Rule 12(b)(2), for improper venue under 12(b)(3), and for failure to state a claim under Rule 12(b)(6). For the reasons that follow, the Court denies each of Aquino's motions for dismissal, with the exception of the Rule 12(b)(6) motion, which the Court grants in part.

## A.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

Dismissal under Rule 12(b)(1) is warranted where a federal court lacks constitutional or statutory power to adjudicate the case. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted). "The court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Id.* (cleaned up).

Under 28 U.S.C. §§ 1331 and 1332, respectively, a federal court may exercise jurisdiction only where a "federal question" is presented, or where the plaintiff and the defendant are citizens of different states and the amount in controversy exceeds $75,000. Cartiga argues that, insofar as the federal DTSA claim fails "as a matter of law," supplemental jurisdiction may not be exercised over the state-law claims. D. Mem. at 2. That argument is easily put aside because, as explained below, the Court denies Aquino's Rule 12(b)(6) motion with respect to the federal DTSA claim, which independently supports federal question jurisdiction under § 1331.

In any event, the AC adequately pleads diversity jurisdiction. AC ¶ 15. The parties are completely diverse. A limited liability company takes on the citizenship of each of its members. *See Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012). Cartiga's five members are each citizens of Delaware or the Cayman Islands. AC ¶ 9. Aquino, meanwhile, is domiciled in Georgia. *Id.* ¶ 12. And as for the amount-in-controversy requirement, it is "hardly onerous"; the plaintiff enjoys a "a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Scherer v.*

6

*Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003). Here, the AC pleads an amount in controversy exceeding $75,000. AC ¶ 15. And the surrounding allegations supply "a reasonable probability" that the claims at issue exceed the jurisdictional amount, insofar as Aquino's wrongs, as alleged, caused Cartiga to lose business relationships with current and prospective clients. *Id.* ¶ 126; *Scherer*, 347 F.3d at 397. To overcome the presumption of good faith afforded Cartiga's representation of the amount in controversy, Aquino, as the party opposing jurisdiction, would have to "show to a legal certainty that the amount recoverable does not meet the jurisdictional threshold." *Id.* (citation omitted). She has not even attempted to do so.

The AC thus viably alleges two alternative bases for subject matter jurisdiction. The Court denies Cartiga's 12(b)(1) motion.

**B.    Motion to Dismiss for Lack of Personal Jurisdiction**

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted). Where, as here, discovery has not yet commenced, the plaintiff need only put forth "legally sufficient allegations of jurisdiction" to survive such a motion. *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). The Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (citation omitted). Nevertheless, allegations in support of jurisdiction must be non-conclusory and fact-specific. *See Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998).

There are "two categories of personal jurisdiction: general and specific personal jurisdiction." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014) (citation omitted). General personal jurisdiction subjects a defendant to suit on all claims. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). A court may assert general jurisdiction over a corporation where its "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 119 (2014) (quoting *Goodyear*, 564 U.S. at 919). Specific personal jurisdiction, by contrast, subjects a defendant to suit only for claims that arise out of or relate to the defendant's conduct in the forum state. *See Daimler*, 571 U.S. at 133 n.10.

Here, the Court need not determine whether there is general personal jurisdiction over Aquino because the exercise of specific jurisdiction is clearly proper. Specific jurisdiction is governed by New York's long-arm statute, N.Y. C.P.L.R. § 302(a), which empowers courts in the state to exercise jurisdiction over non-domiciliaries where the claims "aris[e] from" one of four specific kinds of contact with New York, including, relevant here, where the defendant "transacts any business within the state[.]" N.Y. C.P.L.R. § 302(a)(1). New York courts define "transact[ing] business" as "purposeful activity—some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (internal quotations omitted). Thus, "jurisdiction is proper even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted[.]" *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (internal quotations omitted). Even a "single act" in New York may satisfy § 302(a)(1) if it was "sufficiently purposeful" and "substantially related" to plaintiff's

cause of action arising from the transaction. *Licci v. Lebanese Canadian Bank*, 673 F.3d 50, 62, 67 (2d Cir. 2012) (internal quotations omitted).

The AC meets these standards. Indeed, the bulk of Aquino's offending conduct is alleged to have occurred within New York. She is alleged to have "solicit[ed] a number of Plaintiff's referral sources and clients in New York County"; "misappropriated trade secrets of the Plaintiff in New York"; engaged in "tortious interference with Plaintiff's business relationships in New York [and] other suit-related conduct in New York, including but not limited to the solicitation of Cartiga's business relationships located in New York County and New York State"; and "purposefully avail[ed] herself of New York," including by "own[ing] real property located [in Central Harlem,]" which she apparently used while employed with Cartiga. AC ¶¶ 17, 19 (capitalization altered). Construing the facts in the light most favorable to the plaintiff, the Court finds the allegations in the AC sufficient to plead that she "purposefully avail[ed]" herself of "the privilege of conducting business in New York," thus subjecting her to personal jurisdiction under the state's long-arm statute. *Licci*, 673 F.3d at 61, 64.

The exercise of jurisdiction also comports with due process. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010) ("If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution."). That is because, as the Second Circuit has stated, compliance with New York's long-arm statute necessarily reflects compliance with constitutional due process. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006) ("[T]he constitutional requirements of personal jurisdiction are satisfied because application of N.Y. C.P.L.R. § 302(a) meets due process requirements."). In any event, the AC's factual allegations satisfy due process, the test for which consists of a "minimum contacts" and a

"reasonableness" inquiry. *Chloé,* 616 F.3d at 164 (internal quotations omitted). Aquino's New York-based conduct satisfies the minimum-contacts inquiry. *See Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). In the "reasonableness" inquiry, the Court asks whether exercising personal jurisdiction comports with "traditional notions of fair play and substantial justice." *See Int'l Shoe,* 326 U.S. at 316 (internal quotations omitted). The factors guiding that inquiry are: (1) the burden that exercising jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *See Asahi Metal Indus. Co. v. Superior Ct.,* 480 U.S. 102, 113–14 (1987); *see also A.I. Trade Fin., Inc. v. Petra Bank,* 989 F.2d 76, 83 (2d Cir. 1993).

These factors support the exercise of jurisdiction over Aquino. "While the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry, it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Chloé,* 616 F.3d at 165 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477 (1985)). Again, Aquino has not even attempted to make this showing. Her conclusory statement that New York has only a "weak interest" in adjudicating the case here, *see* D. Mem. at 9, does not overcome the AC's allegations that Aquino's business transactions in New York put her on ample notice to reasonably expect "being haled into court []here." *Burger King,* 471 U.S. at 474 (internal quotations omitted).

The Court thus denies the Rule 12(b)(2) motion.

### C.    Motion to Dismiss for Improper Venue

Cartiga next moves to dismiss for improper venue under Rule 12(b)(3).  Venue is proper

in a judicial district "in which a substantial part of the events or omissions giving rise to the

claim occurred." 28 U.S.C. § 1391(b)(2).  To ascertain whether venue is proper, the Second

Circuit instructs district courts to first "identify the nature of the claims and the acts or omissions

that the plaintiff alleges give rise to those claims" and then "determine whether a substantial part

of those acts or omissions occurred in the district where suit was filed." *Daniel v. Am. Bd. of

Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005).  The plaintiff bears the burden of pleading

venue. *See Amaker v. Haponik*, 198 F.R.D. 386, 391 (S.D.N.Y. 2000).

Venue is clearly proper here.  A substantial part of the events giving rise to Cartiga's

claims are alleged to have occurred in New York County. *See* AC ¶ 17–19.  Aquino claims that

Georgia would be a proper venue because she lives there. *See* D. Mem. at 6 (citing 28 U.S.C.

§ 1391(b)(1)).  But Section 1391(b)(2) "contemplates that venue can be appropriate in more than

one district." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005).  And here, the AC

alleges that "a substantial part of the events . . . giving rise to the claim" occurred in New York

County, making venue proper here.  28 U.S.C. § 1391(b)(2).  Moreover, the parties' Agreement

designates this District as the sole venue in which to adjudicate "all disputes arising out of or

relating to [it] or its subject matter," which covers the instant case.  AC ¶ 18; *see id.*, Ex. 1.

The Court thus denies Aquino's Rule 12(b)(3) motion.[2]

---

[2] Aquino—cursorily—makes the alternative request that the Court transfer venue pursuant to 28
U.S.C. §1404(a).  The Court denies that motion, based on the parties' Agreement stipulating to
this District as the sole venue to adjudicate disputes of this nature. *See Atl. Marine Const. Co. v.
U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 63–64 (2013) ("When parties agree to a forum-
selection clause, they waive the right to challenge the preselected forum as inconvenient or less
convenient for themselves or their witnesses, or for their pursuit of the litigation. . . . [A] valid
forum selection clause should be given controlling weight in all but the most exceptional

### D.    Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. The Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party.").

On a Rule 12(b)(6) motion, a court "may review only a narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). It includes "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (citation omitted). Here, the Court may consider the parties' Agreement, attached as Exhibit 1 to the Amended Complaint, because it is incorporated by reference in and integral to the AC, *see* ¶¶ 48, 50. *See Goel*, 820 F.3d at 559 ("A document is integral to the complaint

---

cases."); *Redhawk Holdings Corp. v. Craig Invs., LLC*, No. 15 Civ. 9127, 2016 WL 3636247, at *10 (S.D.N.Y. June 24, 2016) (enforcing forum selection clause given defendants' failure to demonstrate "any compelling circumstances that would justify the transfer of th[e] case to their preferred forum"); *Beatie & Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d 367, 395 (S.D.N.Y. 2006) (same).

where the complaint relies heavily upon its terms and effect"; such often involves "a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls" (internal quotations omitted)).

For the reasons that follow, the Court denies Aquino's motion to dismiss the DTSA and breach-of-contract claims, but otherwise grants the motion to dismiss.

### 1.    The DTSA Claim

The DTSA creates a private right of action for the misappropriation of trade secrets. *See* 18 U.S.C. § 1836(b); *Kairam v. West Side GI, LLC*, 793 F. App'x 23, 27–28 (2d Cir. 2019); *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 463–64 (S.D.N.Y.), *aff'd*, 838 F. App'x 582 (2d Cir. 2020). To state such a claim, a complaint must plausibly allege that (1) the plaintiff possessed a trade secret that (2) the defendant misappropriated. *See* 18 U.S.C. § 1836(b)(1); *Inv. Sci., LLC v. Oath Holdings Inc.*, No. 20 Civ. 8159, 2021 WL 3541152, at *3 (S.D.N.Y. Aug. 11, 2021).

### a.    *Possession of Trade Secrets*

The DTSA defines trade secrets as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes[.]" 18 U.S.C. § 1839(3). Such information qualifies as a "trade secret" only if:

> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

*Id.*

At the motion-to-dismiss stage, a complaint must plead the trade secret(s) "with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 422 (S.D.N.Y. 2021) (internal quotations omitted). Here, the AC identifies five categories of information which it alleges were trade secrets: (1) the identity of particular referral sources; (2) the identity of Cartiga's clients who obtain more funding than other clients; (3) client lists; (4) rates offered to clients; (5) Cartiga's strategic plans for accessing, obtaining, and retaining those clients and relationships. AC ¶¶ 59–61. For the following reasons, the AC states a plausible claim as to each.

*First*, the AC describes measures Cartiga has taken that are aimed at safeguarding the secrecy of each category of information. Cartiga requires employees to execute confidentiality, non-compete, non-solicitation, and non-interference provisions. AC ¶ 114. It maintains its confidential information in an internal database, accessible only to Cartiga employees with an authorized username and password. *Id.* It requires the use of usernames and passwords for cases involving email or file sharing. *Id.* It utilizes firewall software to screen out unauthorized users. *Id.* Cartiga also requires employees to review their confidentiality commitments and sign a form acknowledging such obligations. *Id.* These measures accord with those regularly held to qualify as reasonably protective of confidential information. *See Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 667, 675 (S.D.N.Y. 2022) (reasonable measures include using an internal filing system "accessible only to employees with an authorized username and password," and signing "a confidentiality provision and a non-solicitation provision"); *Oath Holdings*, 2021 WL 3541152, at *3 (reasonable measures include "the use of confidentiality agreements, password-protection, sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential in an employee

14

handbook, and frequently reminding employees of the need to maintain confidentiality" (internal quotations omitted)); *Ad Lightning Inc. v. Clean.io, Inc.*, No. 19 Civ. 7367, 2020 WL 4570047, at *3 (S.D.N.Y. Aug. 7, 2020) (reasonably protective measures include "requiring employees and clients to sign non-disclosure agreements" and limiting access to proprietary information "to parties with permission to view such information" after signing contracts with confidentiality provisions).

*Second*, the AC alleges that the protected information derives its economic value from not being known to others. *See Catalyst Advisors*, 602 F. Supp. 3d at 674 ("*sine qua non*" of whether client data constitutes a trade secret is whether "the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products, or, by contrast, the customers are not known in the trade or are discoverable only by . . . the expenditure of substantial time and money." (cleaned up)). Here, the AC alleges that each category of information is "not known or generally available in the industry" and "extremely valuable to Cartiga's competitive position in the market, and any competitor would derive an unfair business advantage through the unauthorized use or disclosure of Cartiga's confidential information." AC ¶ 26 (capitalization altered). Certain referral sources are better than others, including in evaluating the strength and capacity for resolution of particular clients' cases, and these qualities cannot be obtained via a "simpl[e] Google" search, Pl. Mem. at 14, making its confidential evaluations of these "critical to the success of Cartiga's business." AC ¶ 23.

Aquino protests that the AC pleads Cartiga's trade secrets in too generalized a manner. *See* D. Mem. at 10–12. The Court, however, sustains that pleading. A plaintiff cannot "get away with nebulous descriptions at the highest level of generality," but the Second Circuit has not

required that a trade secret be pled with a particular degree of specificity, and "a DTSA plaintiff

has no obligation to reveal its secrets in the Complaint simply to prove that they exist." *Catalyst*

*Advisors, L.P.*, 602 F. Supp. 3d at 672 (cleaned up); *see also Broker Genius, Inc. v. Zalta*, 280 F.

Supp. 3d 495, 515 (S.D.N.Y. 2017) ("While neither the New York Court of Appeals nor the

United States Court of Appeals for the Second Circuit has expressly required trade secrets to be

identified with any particular degree of specificity, it is evident that a vague and indefinite piece

of information cannot be protected as a trade secret." (internal quotations omitted)).  Rather, a

complaint must plead its trade secrets only with enough specificity to "place[] a defendant on

notice of the bases for the claim being made against it." *Syntel Sterling Best Shores Mauritius*

*Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 801 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 352

(2023).

That standard is met here.  The AC is sufficiently specific as to the identified categories

of trade secrets so as to put Aquino on notice of what she is alleged to have misappropriated.  *See*

*In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) ("Confidential proprietary data relating to

pricing, costs, systems, and methods are protected by trade secret law."); *Kraus USA, Inc. v.*

*Magarik*, No. 17 Civ. 6541, 2020 WL 2415670, at *6 (S.D.N.Y. May 12, 2020) ("[C]ustomer

lists and pricing information have traditionally been considered trade secrets"); *LinkCo, Inc. v.*

*Fujitsu Ltd.*, 230 F. Supp. 2d 492, 498 (S.D.N.Y. 2002) (identifying customer lists as trade

secrets); *Hudson Hotels v. Choice Hotels Int'l*, 995 F.2d 1173, 1176–77 (2d Cir. 1993),

*abrogated on other grounds*, *Nadel v. Play-by-Play Toys & Novelties*, Inc., 208 F.3d 368, 379

n.9 (2d Cir. 2000) (same).  And compilations of client information—a centerpiece of the claim

here—have been held to qualify at the pleadings stage as trade secrets where acquiring such

information is alleged to have taken considerable experience and effort. *See id.* ("Compilations

of information, traditionally viewed and protected under trade secret law, are items like customer and supplier lists and pricing and cost information."); *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44–46 (2d Cir. 1999). Here, the AC alleges that Cartiga "expended substantial resources and ingenuity collecting, compiling, and protecting" each category of information, which helps "develop and maintain its reputation and goodwill in the legal funding market." AC ¶¶ 24, 72. This leverage, it alleges, is "especially" significant in the legal funding industry, where "successfully acquiring business from clients depends largely upon pricing and other key terms and performance metrics." *Id.* ¶ 72.

Aquino will be at liberty to argue, at summary judgment, that the facts adduced cannot sustain Cartiga's claims of trade secret status as to some or all categories at issue. But Cartiga's pleadings on this point are sufficient. *See Catalyst Advisors*, 602 F. Supp. 3d at 674 (upholding trade secret allegations at the pleadings stage while recognizing possible need for amplification later).

b. *Misappropriation*

Under the DTSA, a complaint must also plead that the defendant misappropriated a trade secret (1) by acquiring a trade secret by improper means, or (2) disclosing or using the trade secret without consent. *See AUA Private Equity Partners, LLC v. Soto*, No. 17 Civ. 8035, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018) (citing 18 U.S.C. § 1839(5)). The AC plausibly alleges that Aquino used and disclosed trade secrets without Cartiga's consent. AC ¶ 117. Aquino counters that she "lawfully accessed 'trade secrets' to do her job" and used these only while employed by Cartiga. *See* D. Mem. at 16–17. But that contention conflicts with the AC's allegations, which must be credited at this stage, that Aquino "misappropriated the trade secrets during *and after* the termination of her employment . . . for the benefit of herself and/or a

competitor," which ultimately "resulted in the severance of Cartiga's prospective business relationships with Cartiga's current and prospective clients and relationships." AC ¶¶ 116–17, 126 (emphasis added); *see ExpertConnect, L.L.C. v. Fowler*, No. 18 Civ. 4828, 2019 WL 3004161, at *6 (S.D.N.Y. July 10, 2019) (misappropriation sufficiently alleged where complaint pled that "Defendants disclosed and used [plaintiff's] trade secrets to solicit [plaintiff's] clients without plaintiff's consent," causing the plaintiff "to lose a major client." (internal quotations omitted)).

The Court thus denies the motion to dismiss the AC's DTSA claim.

### 2.    Breach of Contract

Aquino moves to dismiss the AC's breach-of-contract claim. "To state a claim in federal court for breach of contract under New York law, a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996); *see also Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019). Here, the AC alleges that Aquino breached the Agreement's confidentiality, non-solicitation, non-interference, and non-compete clauses by using and misappropriating Cartiga's confidential information, soliciting current and prospective Cartiga clients, and facilitating the severance of Cartiga's business relationship with current and prospective clients for her professional benefit. AC ¶¶ 96–104, 126. These allegations state a plausible claim of breach. *See Spotlight Ticket Mgmt., Inc. v. Daigle*, No. 23 Civ. 10035, 2024 WL 3966900, at *7 (S.D.N.Y. Aug. 28, 2024) (even where "[plaintiff's] specific allegations of [defendant's] competitive conduct are sparse, they suffice to state a claim for breach of contract."). And Aquino does not dispute the adequacy of the claim of

breach. She argues instead that the Agreement's restrictive covenants are unenforceably vague and overbroad. *See* D. Mem. at 18–20.

Under New York law, restrictive covenants must be "reasonable," meaning they must be "reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 106 (2d Cir. 2024) (quoting *BDO Seidman v. Hirschberg*, 93 N.Y.2d 382, 389 (1999)). Aquino challenges Cartiga's covenants, depicting the Agreement as not defining Cartiga's business or its geographic reach while barring her from seeking business "from any customer or prospective customer" of Cartiga's, "even those she had never met, did not know about, and for whom she had done no work." D. Mem. at 19–20 (cleaned up). Cartiga, for its part, defends the Agreement's restrictions as limited to "the geographic territories where Cartiga does business" and effective for only a year. Pl. Mem. at 16. And, it argues, even if some portion of the covenants were held unenforceable, provisions that protect legitimate business interests may be sustained. Pl. Mem. at 16.

At this early stage of litigation, the Court cannot find the restrictive covenants *per se* unenforceable. Assessing whether such a covenant is reasonable in general presents a "fact-bound inquiry." *Spotlight Ticket Mgmt.*, 2024 WL 3966900, at *8. Accordingly, "courts ordinarily do not determine their enforceability on motions to dismiss." *Id.* (citing *Installed Bldg. Prods., LLC v. Cottrell*, No. 13 Civ. 1112, 2014 WL 3729369, at *8 (W.D.N.Y. July 25, 2014) ("As should be obvious, these are all questions that can only be answered based on a more fully[] developed record. Accordingly, the Court cannot conclude that the non-compete agreement is unenforceable as a matter of law."); *see also Twitchell Tech. Prods., LLC v. Mechoshade Sys.*, LLC, 208 N.Y.S.3d 657, 671 (2d Dep't 2024) ("[A]s with overly broad

restrictive covenants in employment agreements, in order to determine whether an overly broad

restrictive covenant in an ordinary commercial agreement is capable of partial enforcement,

courts should conduct a case specific analysis, which likely requires a more developed record

than is available at this stage of the litigation."). Consistent with that precept, the New York

Court of Appeals has emphasized that "[t]he prevailing, modern view rejects a per se rule that

invalidates any overbroad employee agreement not to compete." *BDO Seidman*, 93 N.Y.2d at

394. Instead, its "'flexible position' contemplates the development of a record regarding the

parties' relationship and industry." *Spotlight Ticket Mgmt.*, 2024 WL 3966900, at *10 (citing

*BDO Seidman*, 93 N.Y.2d at 394); *see also id.* ("[I]t would be inappropriate to dismiss the action

at this stage without affording the parties an opportunity to develop facts relevant to the

reasonableness of the contracts and potential severability of overbroad portions."); *Brown &*

*Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 371 (2015) ("[O]n this record and at this early stage of

the action when little discovery has taken place, dismissal of the portion of the breach of contract

claim based on the non-solicitation provision in the employment agreement is inappropriate.").

Such is the case here. On its facial review, without the benefit of discovery, the Court

cannot find any of the restrictive covenants inherently invalid. That holding is of course without

prejudice to Aquino's right to renew such a claim at summary judgment. The Court expects that,

in discovery, the parties will develop the record as to the reasonableness or not (and the

severability or not) of each contested restriction upon Aquino. The Court, on a full record, will

be better equipped to gauge whether there is a basis for pruning, or invalidating in full, the

restrictions as necessary to "protect a legitimate business interest." *BDO Seidman*, 93 N.Y.2d at

394.

3.       **Tortious Interference with Prospective Economic Advantage**

To prevail on a claim under New York law for tortious interference with prospective economic advantage, a plaintiff "must prove that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003) (citing *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108–09 (2d Cir. 1997). Unlike a claim for tortious interference with contract, which requires a plaintiff to show "no more than that the defendant intentionally and without justification procured a breach of a valid contract of which he was aware," *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)), a claim for tortious interference with prospective economic advantage requires a plaintiff to show that the defendant was "motivated solely by the desire to harm" and not "with a permissible purpose, such as 'normal economic self-interest.'" *Id.* at 262, 264 (quoting *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 628 N.Y.S.2d 408 (3d Dep't 1995), *aff'd*, 87 N.Y.2d 614, 641 (1996). *See also Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004) (alleged interference must be "more culpable" than that required for tortious interference of contract).

Under this standard, courts routinely dismiss such claims where the defendant is alleged to have been motivated "at least in part by its own economic interest." *RBG Mgmt. Corp. v. Vill. Super Mkt., Inc.*, 692 F. Supp. 3d 135, 150 (S.D.N.Y. 2023) (internal quotations omitted). It is thus "very difficult to sustain" such a claim. *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 258 (S.D.N.Y. 1995); *see also, e.g., Hillel v. IQVIA, Inc.*, No. 21-666-cv, 2022 WL 905852, at *3 (2d Cir. Mar. 29, 2022) (affirming dismissal of tortious interference claim

where defendants acted in "normal economic self-interest" (internal quotations omitted));
*Merkin*, 791 F.3d at 262 (affirming dismissal of tortious interference claim where plaintiff did
not allege defendant "acted for the sole purpose of harming [the defendant]"); *Abbas v. Martin*,
689 F. App'x 43, 44 (2d Cir. 2017) (plaintiff "has not plausibly alleged that [the defendant's]
motivation was devoid of legitimate economic self-interest" (internal quotations omitted));
*Camelot SI, LLC v. ThreeSixty Brands Grp. LLC*, 632 F. Supp. 3d 471, 484 (S.D.N.Y. 2022)
("Nowhere does the FAC allege that the Defendants acted *solely* out of malice. Even construing
the facts in the light most favorable to [plaintiff], economic self-interest is at least *a* reason for
Defendants' behavior." (emphasis in original)); *Darby Trading Inc. v. Shell Int'l Trading &
Shipping Co.*, 568 F. Supp. 2d 329, 346 (S.D.N.Y. 2008) (same) (collecting cases).

Here, the AC nowhere alleges that Aquino acted with the "sole purpose" of harming the
company. *Merkin*, 791 F.3d at 262. It thus fails to meet the demanding standard required to
state a claim for this tort. *See Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 467
(S.D.N.Y. 2006). Quite the contrary, the AC pleads that Aquino "reached out to business
contacts of Cartiga . . . for the purpose of seeking to obtain the business for herself and/or a
direct competitor of Cartiga." AC ¶ 53 (capitalization altered). The AC's allegations thus
support that Aquino was motivated "at least in part" by her own economic interest, defeating this
claim. *RBG Mgmt. Corp.*, 692 F. Supp. 3d at 150 (internal quotations omitted); *Carvel*, 3
N.Y.3d at 362 (dismissing tortious interference with prospective economic advantage claim
where "[i]t is undisputed that Carvel's motive in interfering with the franchisees' relationships
with their customers was normal economic self-interest").[3]

---

[3] The claim would independently fail because it is duplicative of the breach-of-contract claim, as
the theory of liability and recovery is "identical for both[.]" *IKB Int'l, S.A. v. Wells Fargo Bank,
N.A.*, 40 N.Y.3d 277, 292 (2023).

### 4.    Breach of Fiduciary Duty

To recover damages for breach of fiduciary duty under New York law, a plaintiff must show (1) the existence of a fiduciary duty; (2) a knowing breach of that duty; and (3) resulting damages. *See Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citing *Barrett v. Freifeld*, 883 N.Y.S.2d 305, 308 (2d Dep't 2009)). "Under New York law, an employee owes a duty of good faith and loyalty to his employer." *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 659 (S.D.N.Y. 2005), *aff'd sub nom. Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006). Breach of that duty is actionable as a breach of fiduciary duty. *See Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 92 (S.D.N.Y. 2022). However, "[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." *William Kaufman Org., Ltd. v. Graham & James LLP*, 703 N.Y.S.2d 439, 442 (1st Dep't 2000). Such claims are duplicative where they "are premised upon the same facts and seek the same damages for the alleged conduct." *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 106 (S.D.N.Y. 2013); *Wells Fargo Bank*, 40 N.Y.3d at 292 (same)).

Such is the case here. The AC alleges that Aquino breached her fiduciary duties of loyalty by "(a) soliciting Cartiga's customers for the benefit of herself and/or a competitor; (b) using Cartiga information for the benefit of herself and/or a competitor; (c) planning a departure designed to harm Cartiga by misappropriating its trade secrets; and/or (d) diverting business opportunities to herself and/or a competitor of Cartiga." AC ¶ 132. That is the exact conduct on which the breach-of-contract claim is based. The Court thus dismisses the fiduciary duty claim as duplicative. *See Catalyst Advisors*, 602 F. Supp. 3d at 679–80 ("Plaintiff's claim is identical in substance to its breach of contract claim and is therefore duplicative." (collecting cases)).

## CONCLUSION

For the foregoing reasons, the Court denies Aquino's motions to dismiss under Rules 12(b)(1), 12(b)(2), and 12(b)(3), and grants in part and denies in part her motion to dismiss under Rule 12(b)(6). The Clerk of Court is respectfully directed to terminate all pending motions. By separate order, the Court will schedule an initial conference and set a deadline for submission of a proposed case management plan.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: February 4, 2025
      New York, New York